UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

---

CDP HOLDINGS GROUP, LLC,

Plaintiff,

— against —

INTEGRATED MEDICAL PARTNERS LLC,

Defendant.

No. 18 Civ. 4109

**COMPLAINT**

**JURY TRIAL DEMANDED**

Plaintiff CDP Holdings Group, LLC ("CDP Holdings") by and through its undersigned counsel alleges as follows:

1.      This is an action for breach of contract.  Plaintiff seeks to recover against a medical billing company whose gross negligence and intentional mismanagement resulted in over ten million dollars in lost revenue.

2.      CDP Holdings is a company that manages the business affairs and non-clinical operations of a number of radiology practices in the New York region.  Defendant Integrated Medical Partners LLC ("IMP") is a company that provides billing and collections services to medical practices.

3.      On November 20, 2014, CDP Holdings entered into a Revenue Cycle Management Services Agreement (the "Agreement") with IMP to handle the complex medical billing and collections for the medical practices that CDP Holdings manages ("Managed Practices" and together with CDP Holdings, "CDP").  CDP relied upon IMP and its expertise to ensure that CDP was properly compensated for the medical services that it provided and that any problems in payment were identified and resolved promptly.  CDP gave IMP access to its

computer systems and communicated regularly with IMP concerning billing and collections issues.

4.     Over the course of the next several years, IMP utterly failed to carry out its obligations under the Agreement.  As discussed in greater detail below, IMP failed to bill or otherwise incompletely or incorrectly billed, thousands of procedures to insurance companies; so badly botched the payor billing protocols, guidelines, and instructions on the procedures that it did submit that insurers refused to pay for some or all of the services rendered; failed to bill patients properly (or in some cases at all) before sending the patients to collections; failed to provide accurate information to collections, rendering bills essentially uncollectable; and failed to provide basic reporting concerning claim denials, MIPS/PQRS compliance, refunds, and payment provider credentialing as required under the Agreement

5.     IMP actively concealed this misconduct by refusing to provide accurate information concerning its activities to CDP.  In some cases, IMP failed to provide any information at all, in others it distorted or scrambled the data so that CDP could not readily determine the scale of IMP's failures.

6.     As a result of this categorical dereliction of duty, CDP lost out on over ten million dollars in fees.

7.     CDP now brings suit against IMP to vindicate its rights under the contract and recoup the enormous losses suffered as a result of IMP's misconduct.

## PARTIES

8.     Plaintiff, CDP Holdings, is a limited liability corporation organized and existing under the laws of the State of Delaware with offices located in Forest Hills, New York.

9.      Upon information and belief, Defendant IMP is a limited liability corporation organized and existing under the laws of the State of Wisconsin with its principal office located at 700 W. Virginia Street, Suite 305, Milwaukee, Wisconsin 53204.

## JURISDICTION AND VENUE

10.      The parties have consented to the Court's jurisdiction and venue over this action. Paragraph 17.3 of the Agreement provides that "[e]xclusive venue and jurisdiction for any dispute arising out of this Agreement shall be the state or federal courts located in New York."

11.      The Court has subject matter jurisdiction over this suit pursuant to 28 U.S.C. § 1332.  Both Plaintiff and Defendant are limited liability companies whose residency is determined by that of their members.  All members of Plaintiff reside in Brooklyn, New York and upon information and belief, no member of Defendant resides in New York.  The amount in controversy in this action exceeds $75,000, exclusive of interest and costs.

12.      Additionally, the Court has personal jurisdiction over this action pursuant to CPLR § 302, as this dispute concerns business, specifically medical billing and collection services, transacted in the state of New York.

13.      On information and belief, this Court also has jurisdiction over this action pursuant to CPLR § 301.  Defendant regularly conducts business within the state of New York and is properly subject to general *in personam* jurisdiction for suits commenced within the state of New York.

## FACTUAL ALLEGATIONS

**Background**

14.      CDP Holdings manages the business affairs and non-clinical operations of its Managed Practices, including Long Island Radiology Associates, PC, D.R. Rossi, MD PC,

Greater Northeast Radiology Services, PC and Neighborhood Radiology Services, PC, each a radiology practice with multiple locations in New York City, Long Island, and upstate New York.  Doctors affiliated with the Managed Practices treat patients throughout the state of New York and perform over one hundred thousand procedures every year.

15.     Medical billing is an extraordinarily complex process, driven in part by the use of specialized CPT (Current Procedure Terminology) "codes" to classify compensable services.  A CPT code is a unique identifier ascribed to a medical procedure that allows a payment provider, such an insurance company, to easily understand what was done to the patient and what compensation is appropriate.  For example, a chest x-ray can be classified as CPT Code 71045.  An MRI of the brain without administration of contrast can be classified as CPT Code 70551.

16.      A medical practice that wishes to be compensated for its work must ensure that its bill is coded properly and fully complies with the volumes of guidelines and coding instructions promulgated by a variety of government and private entities.  Because of the size and scale of the practices managed by CDP Holdings, bills from CDP may be submitted to any of dozens of payment providers, all of which have highly individualized requirements.  The level of work involved in properly preparing, submitting and collecting bills for CDP makes doing so internally extremely difficult.

17.     Because medical professionals often require significant help in preparing their bills and ensuring that they are collected and paid, an entire industry of companies exists to provide billing and collections support services to doctors and their practices.

18.     Defendant IMP holds itself out as one such support service, or in its words, a "revenue cycle management" company.   It claims to possess significant knowledge and experience "in billing and collection systems and procedures relating to the management of

patient accounts receivable and operations of medical business offices."  By virtue of this knowledge and experience, IMP claims to be able to manage the medical billing and collections activity necessary for large medical practices and groups of practices to be fully compensated for the work that they do.

19.     After some negotiations, CDP hired IMP to provide these services.  The parties signed a contract (the "Agreement") memorializing the terms of the deal.

**The Agreement**

20.     CDP and IMP entered into the Agreement on November 20, 2014.

21.     Pursuant to Paragraph 1 of the Agreement, IMP agreed to "bill and seek to obtain reimbursement in a timely manner for [CDP]'s charges for procedures rendered on or after the Effective Date . . . through the billing of [CDP]'s patients and payors",

22.     Paragraph 1 also obligated IMP to properly handle "the management of [CDP]'s accounts receivable."

23.     In addition, Paragraph 1 of the Agreement obligated IMP to provide those services included on several Schedules to the Agreement and to assist "in payor negotiations, physician credentialing and other related business office functions … to ensure proper handling and collection of patient accounts receivable."

24.     The Schedules to the Agreement obligated IMP to, *inter alia,* maintain a "Client Specific Financial Budget" and "Client Specific Coding Rules Module," and to provide management reports and assistance with audits and regulatory requirements.

25.     To ensure that all of these obligations were properly carried out, Paragraph 1 of the Agreement required IMP to "maintain a fully equipped and staffed office operation to provide the Services."

26.     Paragraph 4.2 of the Agreement obligated IMP to meet "mutually agreed upon performance metrics consistent with RBMA performance standards adjusted for Client-specific fee schedule, payor contracted reimbursement rates and payor, patient and modality mix influences."

27.     In exchange for these services, IMP was to be paid significant fees in accordance with the express provisions of the Agreement.

28.     The Agreement commenced on February 1, 2015.

29.     After the commencement of the Agreement, IMP was responsible for providing a variety of services for CDP.  These services can broadly be categorized into billing services, collections services, and credentialing and compliance services.

**Billing Services**

30.     As described above, under the Agreement, IMP was responsible for generating bills on behalf of CDP and submitting them to insurance companies and other payment providers for payment.

31.     To do this effectively, IMP was given continuous access to CDP's Radiology Information System ("RIS").  RIS is the computer system that CDP uses to track the medical tests and other services performed for patients.  IMP was also given access to a live interface of HL7 messages concerning treatment, including Order Response Messages ("ORM") and Observation Results ("ORU").

32.     In addition to its access to RIS and the live interface, IMP was also provided with daily "Charge Out" files containing information about all radiology services performed that day.

33.     When it received the daily Charge Out files, IMP was responsible for separating the services into two categories.  The services done for "workers compensation" and "no fault" patients were to be sent to a separate billing company under a separate agreement.

34.     Once "workers compensation" and "no fault" services were removed, IMP was responsible for preparing bills for the remaining work.

35.     To properly prepare the bills, IMP was given the payment provider (often an insurance company) information for each patient and was responsible for properly coding the services in accordance with the rules, regulations, and guidelines for that provider.  To ensure that coding was done properly, IMP was responsible for cross referencing the information contained on the Charge Out file with patient information from the RIS system and the appropriate payer's reimbursement rules and procedures.

36.     Once properly coded, IMP was responsible for submitting the completed bills to the appropriate insurance clearinghouse for acceptance or rejection.

37.     If a bill was rejected by the clearinghouse, IMP was responsible for notifying CDP, determining why the bill was rejected, and correcting any necessary problems.  For example, if a bill was rejected because of incomplete information about the patient or procedure, IMP was responsible for obtaining the necessary information from CDP's RIS, or, if not otherwise contained therein, directly from CDP so that the bill could be updated.  If a bill was rejected because of improper coding, IMP was responsible for fixing the coding and resubmitting a corrected bill, including any necessary addendums from CDP's radiologists.

38.     To ensure that any billing problems did not repeat themselves, IMP was required to prepare a monthly denial report for CDP that identified all bills that were rejected and the

reasons for that rejection.  IMP was also required to conduct a month end meeting with CDP to go over the monthly reports.

**Collections Services**

39.     IMP was also responsible for ensuring that CDP was paid for its work in accordance with the applicable payer's fee schedule after bills were submitted and managing collections efforts against delinquent accounts.

40.     To ensure that patients were always treated fairly, IMP was required to follow a standardized process when collecting a bill from individuals.

41.     Before sending a patient to a third-party collections service, IMP was required to send two billing statements to the patient by mail.  If the patient did not pay, it was then required to follow up with a phone call and a final notice.

42.     Only if a patient did not pay a bill after receiving a final notice was IMP to send the account to a third-party collections service.

43.     When bills were sent to collections, IMP was required to furnish the third-party collections service with a file containing the information necessary to collect.  This meant providing an accurate account of the amount due and properly accounting for any partial payments made by the patient or his or her payment provider.

**Credentialing and Compliance Services**

44.     IMP was also responsible for managing certain credentialing and compliance services for CDP.  This was necessary to ensure that CDP was fully-compensated for the services provided and all requests for reimbursement were submitted in a legally compliant manner.

45.     Payment providers, such as insurance companies, often maintain a list of doctors, medical practices, and practice locations that are "credentialed."  This credentialing simply

means that the payment provider has agreed to pay for approved services performed by those doctors or medical practices who have undergone a payer specific "vetting process." If a doctor or practice is not credentialed, some payment providers will not pay for any services performed and billing disputes can arise.

46.     IMP was responsible for verifying that each CDP doctor, practice, and practice facility was properly credentialed for each payment provider that the practice accepted. If a new doctor was hired or a new facility was opened, IMP was responsible for filling out the necessary paperwork with the payment providers to ensure that they would be considered participating with such payer such that the payer would pay for any medical services performed by the practice and its physicians. If a payment provider rejected a bill for lack of credentialing, IMP was responsible for rooting out the underlying reason that the payment was denied, including, without limitation, verifying whether the services had been performed by a doctor or facility without credentialing and ensuring that any lack of credentialing was swiftly identified and corrected.

47.     In addition, IMP was responsible for tracking MIPS/PQRS compliance by physicians associated with CDP.

48.     MIPS stands for "Merit-Based Incentive Payment System." It is a program by which Medicare will pay doctors and practices additional compensation for the services that they provide, so long as they adhere to certain guidelines.

49.     Prior to 2017, Medicare employed a similar program called PQRS. PQRS stands for "Physician Quality Reporting System." PQRS was a quality reporting program that encouraged individual eligible professionals and group practices to report information on the

quality of care to Medicare.  Like MIPS, PQRS compliance was tracked by Medicare and impacted Medicare reimbursement rates.

50.     IMP was responsible for tracking whether CDP physicians were complying with the MIPS/PQRS reporting standards when treating Medicare patients.  This required IMP to review the notes generated by those physicians to ensure that the proper quality measures were reflected and the proper verbiage was included.

51.     MIPS/PQRS compliance is required to ensure the highest possible reimbursement for Medicare services.  If MIPS/PQRS standards are not complied with, Medicare can categorically reduce prospective reimbursements for the doctor or practice by 2%.

52.     In addition, IMP was responsible for tracking insurance recoupments and refunds for CDP.  In fact, proper computation of the fees due to IMP required that recoupments and refunds be identified.

53.     Insurance recoupments occur when an insurance company deducts an overpayment made for services performed for one patient from the amount that it is willing to pay for services to another patient.

54.     For example, say an insurance company pays $1000 for a test performed by a practice on Patient A and later determines that only $500 is appropriate.  In lieu of seeking reimbursement for the excess payment, the insurance company may choose to deduct $500 from the next service performed by the practice, regardless of whether Patient A is involved.  So, if the practice performs a $750 test on Patient B, the insurance company may pay only $250.

55.     Refunds occur for a variety of reasons, most commonly when a patient makes a co-pay, deductible, or coinsurance payment for a service that is later determined to be fully reimbursed by his or her insurance company.  They can also occur when there is a payment

dispute with the insurance company and a patient pays for a service that is only later reimbursed by his or her insurer.

**The Side Agreement**

56.     In addition to the Agreement, IMP and CDP entered into another contract (the "Side Agreement") on or about April of 2015.

57.     Pursuant to the Side Agreement, IMP would perform coding and bill submission services for "workers compensation" patients.  These services were excluded from the written Agreement and would normally be handled by another billing company utilized by CDP specifically for workers compensation patients at all of its other facilities.

58.     These claims would be billed out to different payers utilizing different billing rules at a different billing rate than other claims processed by IMP.

59.     IMP and CDP agreed that IMP's successful performance under the Side Agreement during a 2-3 month "trial run" period would be required before deciding whether IMP would be given the opportunity to take over all such processing for CDP.

**IMP Fails At Everything**

60.     IMP's performance after the commencement of the Agreement and Side Agreement was – in short – a disaster.  While promising to leverage its expertise to efficiently and effectively manage CDP's billing and collections, IMP failed in virtually every aspect of its responsibilities.  While CDP is still gathering information concerning the full scope of IMP's misconduct, what has already come to light shows an utter disregard for the promises that it made and a complete failure to even attempt to do its job properly.

61.     As a basic matter, IMP simply failed to prepare or submit bills for enormous numbers of procedures performed by CDP.  While the investigation is still ongoing, CDP has

determined that IMP *failed to submit bills for over 10,000 procedures* between February 2015 and March 2018.  This basic failure to bill resulted in millions of dollars in losses to CDP.

62.     Nor did IMP take care to properly prepare the bills that it did submit.  IMP regularly submitted bills to the wrong payment providers or the wrong addresses.  This resulted in billing disputes, delays in payment, and in many cases services that were never paid for.

63.     IMP also neglected to properly allocate bills between payment providers.  For example, in some cases, insurance carriers and utilization managers must be billed separately to ensure that a bill is paid in full.  IMP routinely billed only one responsible party, resulting in underpayment.

64.     Even where bills were submitted to the right payer, IMP often failed to bill or pursue reimbursement for all work done by CDP's affiliated physicians, resulting in categorical underpayments.  For example, IMP might bill for a radiological scan, but not for the contrast solution administered by the physician during the scan.  Or IMP might bill for a two-dimensional scan when a more complex three-dimensional tomography scan was performed.  And even when IMP initially billed for all work done, it might not actually follow up for reimbursement of all of the work performed.  These two specific errors were made over and over again by IMP, resulting in underpayments of over $550,000.  The total amount lost due to failure to bill or seek reimbursement for all work performed is not known but exceeds $2,000,000.

65.     IMP also wrote off and effectively abandoned enormous amounts in claims owed to CDP.  Despite being instructed that claims were not be written off without authorization, IMP wrote off over $5 million dollars in recoverable claims.

66.     Rather than resolve these persistent problems or disclose the mountain of missing or rejected claims, IMP chose to actively conceal its failures.  It failed to provide the monthly

denial reports as required by the Agreement.  When it did provide information, it scrambled or

bundled the data, obfuscating the reasons why claims were denied so that CDP would not realize

that IMP's conduct was the cause.

67.     For example, each payor of claims provided IMP with Claim Adjustment Reason

Codes ("CARC") and similar payor-specific details in connection with rejected claims.  These

codes correspond to the precise reasons why claims were rejected.  But in its reporting to CDP

IMP bundled multiple CARC codes into meaningless groups that made it impossible for CDP to

determine why its claims had been rejected.  For example, IMP provided CDP with reports

suggesting that thousands of claims had been rejected for "lack of authorization."  In truth, many

of these claims were actually rejected because IMP had mishandled CDP's credentialing.  When

CDP asked for the unbundled CARC codes, IMP refused to provide them, leaving CDP entirely

in the dark as to why its claims were repeatedly denied and, as a result, unable to either correct

the underlying cause, or, if it was able to do so, unable to timely file an appeal to such denials.

The total amount lost because of this misconduct is not known but exceeds $1,500,000.

68.     IMP's collections were equally defective.  Rather than follow the agreed-upon

"two notices, call, then final notice" procedure, it took an ad-hoc approach to collections that

resulted in legions of errors and lost revenue.  Some patients were sent to collections without

ever receiving a bill.  Others were sent enormous bills for procedures that were fully-covered by

their insurance.  As a result of IMP's categorical failures, scores of bills were sent to collections

that could have been easily collected without incident.  Because of the scale of IMP's intentional

misconduct, CDP was required to step in to protect patients and lost significant revenue from

collectable bills.

69.     And the information that IMP ultimately sent to CDP's third-party collections company was frequently useless, making those bills that the third-party collection agency was able to prepare and remit essentially uncollectable.  For example, IMP would send files to collections without an accurate description of the amounts actually owed or theretofore paid, making it impossible for the collections company to negotiate with the patient or pursue legal action.  The lost payments to CDP from uncollectable bills are believed to exceed $1,000,000.

70.     Nor did IMP properly perform its credentialing and compliance services.  Two of CDP's affiliated doctors were improperly credentialed for Fidelis, one of CDP's largest payment providers, for over six months.  This error alone resulted in over $1,000,000 in rejected claims.  In addition, an entire facility was uncredentialed for an extended period of time, resulting in thousands of additional rejected claims.

71.     IMP never properly tracked MIPS / PQRS compliance by CDP physicians, resulting in underpayments / penalties from Medicare of over $600,000.

72.     IMP never properly tracked patient refunds and admitted that it had no ability to track insurance recoupments.  This resulted in overpayments to IMP, unnecessary billing disputes with patients and payment providers, and an inability to prevent billing errors in the future.

73.     IMP also failed to live up to its obligations under the Side Agreement.  Bills were incorrect, submitted at the wrong rates, and reflected the wrong tax id number.

74.     These IMP errors under the Side Agreement resulted in losses of of over $1,000,0000.

**The Relationship Sours and IMP Tries to Cover Its Tracks**

75.     As these legions of failures became apparent, CDP regularly demanded information from IMP concerning the work that it was allegedly performing.  IMP refused to properly deliver this information, including the reports that it had promised to provide in a regular fashion.  In some cases, it never provided the information at all.  The late, missing, or otherwise defective reports include, *inter alia*, denial reports, write-off reports, refund reports, recoupment reports, accession number audit reports, timely filing reports and charge capture reports.

76.     Based on the above breaches, CDP served IMP with a written default notice pursuant to paragraph 12 of the Agreement on May 23, 2017.  This default notice demanded that all of the referenced breaches be cured within 45 days.

77.     None of the breaches were ever cured.

78.     As the relationship soured and CDP continued to flag errors in the few reports that IMP did provide, IMP began to modify its system data to remove evidence of its misconduct.  CDP detected at least some of these changes because CDP's hard copy records did not agree with IMP's database.

79.     IMP also lied about the information that its systems could provide, telling CDP that patient level detail reports could not be generated, despite regularly providing the same reports to other clients.

80.     IMP also began delaying or charging for services that it had previously provided quickly and without charge.  Software interface updates that had previously taken a week to complete suddenly required thirty days and additional charges.

81.     IMP also understaffed its office that was purportedly handling CDP's billing and collections, making it impossible to fulfill its obligations under the Agreement.

82.     In addition, IMP's level of employee turnover is such that its employees had no opportunity to become familiar with and/or accommodate CDP's needs.

83.     Upon information and belief, IMP intentionally sabotaged its performance after the relationship with CDP soured, removing personnel and staffing CDP's account with a "skeleton crew" once it realized that CDP was unlikely to renew the Agreement.  This resulted in additional errors and omissions.

84.     In addition, as the relationship was concluding, IMP stopped processing patient refunds altogether, in a deliberate effort to poison CDP's patient relationships and undermine its business.

## CAUSES OF ACTION

### COUNT ONE
### BREACH OF CONTRACT
**(Breach of the Revenue Cycle Management Services Agreement)**

85.     Plaintiff repeats and realleges each of the foregoing allegations contained in the paragraphs above, as if fully set forth herein.

86.     The Agreement constitutes a valid and existing contract between CDP and Defendant.

87.     CDP has fully performed its obligations under the Agreement.

88.     Defendant has materially breached its obligations under the Agreement by, *inter alia*:

- Failing to submit over 10,000 claims for payment;

- Failing to submit claims to the proper payment provider or to the correct address;

- Failing to allocate bills between payment providers;

- Failing to code bills correctly;

- Failing to code for all services performed by CDP's affiliated practices;

- Failing to correct errors or omissions in bills rejected by payment providers;

- Failing to notify CDP concerning unsubmitted or rejected claims so that billing problems could be corrected;

- Failing to ensure that CDP's affiliated physicians, practices, and practice locations were properly credentialed;

- Failing to notify CDP when bills were rejected or payments reduced due to problems in credentialing;

- Writing off collectable claims without authorization and in direct violation of clear instructions from CDP;

- Failing to follow agreed-upon collections procedures;

- Failing to provide appropriate information to CDP's third-party collections company so that bills could be collected;

- Failing to properly track MIPS / PQRS compliance;

- Failing to properly track insurance recoupments or patient refunds;

- Failing to appropriately staff the office responsible for CDP's account;

- Failing to provide timely or accurate reports, including, *inter alia*, denial reports, write-off reports, refund reports, recoupment reports, accession number audit reports, timely filing reports, and charge capture reports;

- Altering, falsifying, or deleting evidence concerning IMP's failure to honor its obligations under the Agreement.

89.     Defendant's breaches are material.

90.     Defendant's breaches were willful, wanton, intentional and/or constituted gross negligence.

91.     Because of the recurring and repeated nature of Defendant's misconduct, Defendant has committed thousands of separate breaches of the Agreement on dates spanning the entire operative period of the Agreement.  Plaintiff asserts each violation of the Agreement as a distinct claim, as if set forth separately herein.

92.     Defendant's breaches have damaged CDP in an amount to be proven at trial but believed to be in excess of $10,000,000.

## COUNT TWO
## BREACH OF CONTRACT
## (Breach of the Side Agreement)

93.     Plaintiff repeats and realleges each of the foregoing allegations contained in the paragraphs above, as if fully set forth herein.

94.     The Side Agreement constitutes a valid and existing contract between CDP and Defendant.

95.     CDP has fully performed its obligations under the Side Agreement.

96.     Defendant has materially breached its obligations under the Side Agreement by, *inter alia*:

- Failing to properly differentiate between work performed for workers compensation patients and other patients;

- Failing to bill workers compensation patients at the appropriate rate;

- Failing to use the proper tax id on bills generated for workers compensation patients or their payment providers.

97.     Defendant's breaches are material.

98.     Defendant's breaches were willful, wanton, intentional and/or constituted gross negligence.

99.     Defendants' breaches have damaged CDP in an amount to be proven at trial but believed to be in excess of $1,000,000.

**COUNT THREE**
**UNJUST ENRICHMENT**
**(In the Alternative)**

100.    Plaintiff repeats and realleges each of the foregoing allegations contained in the paragraphs above, as if fully set forth herein.

101.    Plaintiff paid IMP hundreds of thousands of dollars in compensation for services that it was allegedly providing under the Agreement and Side Agreement.

102.    IMP was enriched by these payments.

103.    IMP was enriched at the expense of Plaintiff.

104.    IMP failed to provide the promised services.

105.    Plaintiff has suffered damages as a result of IMP's conduct.

106.    To the extent that the Agreement or Side Agreement is held invalid or enforceable as a matter of law, it is against equity and good conscience to allow IMP to retain the sums paid under the Agreement or Side Agreement.

107.    Accordingly, the Court should award damages against Defendant for unjust enrichment in an amount to be proven at trial.

## PRAYER FOR RELIEF

WHEREFORE the Plaintiff prays that this Court:

A.     Award nominal, compensatory, and punitive damages in an amount to be

determined at trial;

B.     Award litigation costs and expenses to Plaintiff, including, but not limited to,

reasonable attorneys' fees;

C.     Award any additional and further relief as this Court may deem just and proper.

**DATED:**     New York, New York
            July 18, 2018

                           MANDEL BHANDARI LLP
                           80 Pine Street, 33rd Floor
                           New York, New York 10005
                           (212) 269-5600

                      By: _____
                           Rishi Bhandari

                      *Attorneys for Plaintiff CDP Holdings Group, LLC*

-20-

## **JURY DEMAND**

Plaintiff hereby demands trial by jury on all issues triable to a jury.

**DATED:**     New York, New York
          July 18, 2018

                    MANDEL BHANDARI LLP
                    80 Pine Street, 33rd Floor
                    New York, New York 10005
                    (212) 269-5600

          By:  _____
                    Rishi Bhandari

          *Attorneys for Plaintiff CDP Holdings Group, LLC*